# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-1086

_____

In re: Racing Services, Inc.

*Debtor*

------------------------------

Kip M. Kaler, as Bankruptcy Trustee for Racing Services, Inc.

*Appellee*

v.

Susan Bala

*Appellant*

_____

Appeal from the United States Bankruptcy
Appellate Panel for the Eighth Circuit

_____

Submitted: November 19, 2013
Filed: February 27, 2014

_____

Before RILEY, Chief Judge, MELLOY and KELLY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Susan Bala appeals a Bankruptcy Appellate Panel's judgment holding the bankruptcy estate of her former employer is entitled to the liquidation proceeds of a cash-value life insurance policy the employer purchased for her. Because the terms of an agreement between Bala and her employer grant the employer only the limited right to receive a repayment of policy premiums from the cash value upon surrender of the policy by Bala, we reverse. Bala at no time surrendered the policy, and therefore, the estate did not possess a right to control the policy or receive its liquidation proceeds.[1]

I.    Background

Susan Bala was an employee and the founder of Racing Services, Inc. ("Racing Services"), a simulcast racing and parimutuel gambling company in North Dakota. Pursuant to a split-dollar/collateral-assignment agreement ("Split-Dollar Agreement"), she owned a cash-value whole-life insurance policy that Racing Services purchased on her behalf. Racing Services was entitled to recoup the premiums it paid for the policy from the policy's accumulated cash value under certain circumstances as defined by the Split-Dollar Agreement. The policy, however, permitted Bala to access the policy's "loan value" which was essentially the policy's paid-up cash value less any existing loans.[2] No party has identified any terms in the Split-Dollar Agreement or in the policy that would have permitted Racing Services to prevent Bala from unilaterally accessing all of the policy's loan value while the policy was in effect.

---

[1]The policy also granted to the employer a right to reimbursement from the policy proceeds upon Bala's death or from any distributions at policy maturation. No party alleges these provisions apply in the present circumstances.

[2]The policy defined the loan value as "the cash value on the date to which all due premiums are paid; the cash value of any dividend additions; and the value of any dividends left at interest; less: any outstanding loans and loan interest; [and less] interest on the loan to the end of the current policy year."

In 2003, Bala and Racing Services were charged in a federal criminal indictment alleging gaming and money laundering violations. In 2004, Racing Services filed for bankruptcy. In July 2004, Kaler, the Trustee for the bankruptcy estate, caused Racing Services to stop making premium payments on Bala's life insurance policy. Premium payments continued, however, pursuant to an "Automatic Premium Loan Provision" in the policy that utilized loans against the accumulated cash value in the policy to pay premiums.

In February 2005, Bala and Racing Services were convicted of the federal criminal charges. Bala was sentenced to 27 months' imprisonment, ordered to forfeit over $19 million, and held jointly and severally liable for a forfeiture order against Racing Services of over $99 million. Bala and Racing Services filed timely appeals from the criminal convictions. While the appeals were pending, the following events took place.

First, in September 2006, the United States Attorney for the District of North Dakota (the "DOJ") filed a motion in Bala's criminal case to forfeit substitute assets identifying the life insurance policy as an asset to be substituted for forfeiture. In October 2006, the district court granted the motion and entered a preliminary order to substitute the policy for forfeiture. The October 2006 order substituting the policy was not a final order, and the earlier criminal judgment itself had not identified the policy as an asset to be forfeited.

At that time, the Trustee claimed an interest in the policy based on the Split-Dollar Agreement. The parties, however, do not allege that the Trustee filed any type of claim or objection in the district court to contest the DOJ's motion to substitute the policy as a forfeiture asset. Later, on January 26, 2007, the Trustee and the DOJ entered into an agreement ("Asset-Division Agreement") that the Trustee and the DOJ indicated was to be subject to the approval of the bankruptcy court. Pursuant to the Asset-Division Agreement, the Trustee and the DOJ were to obtain the

"cancellation/liquidation" of the policy and share on a 50/50 basis the "proceeds recovered from cancellation/liquidation of the policy." The DOJ's share was to be held by the district court pending resolution of the criminal appeal. In Paragraph 3 of the Asset-Division Agreement, the Trustee and the DOJ agreed that:

> *The bankruptcy estate is unable to involuntarily cancel the policy or withdraw its value.* Inasmuch as Susan Bala is the owner of the policy, it would necessarily require her approval for cancellation of the policy or withdrawal of its cash value. Susan Bala has refused to cancel the policy or withdraw its cash value to pay the balance due the Debtor/bankruptcy estate.

(Emphasis added). The bankruptcy court at no time approved the Asset-Division Agreement.

On January 27, 2007, the insurance company sent a letter and a $64,000 check to the DOJ (presumably in response to a DOJ demand since the bankruptcy court had not approved the Asset-Division Agreement and the district court had not entered a final order of forfeiture). The insurer also sent a letter to Bala advising that the policy had been "surrendered" and giving instructions as to what Bala should do if she wished to reinstate the policy.

On February 23, 2007, after the insurer had already sent the policy's liquidated funds to the DOJ, the district court entered an order noting that Bala might not have received proper notice of the government's September 2006 motion to substitute the insurance policy as a forfeiture asset. The district court's order directed the parties to cease attempts to terminate/surrender the policy and to hold any proceeds already received from the insurer pending resolution of the criminal appeals. No party attempted to reinstate the policy.

-4-

On March 6, 2007, the Eighth Circuit Court of Appeals reversed the convictions and the underlying forfeiture order. United States v. Bala, 489 F.3d 334 (8th Cir. 2007). In July 2007, the DOJ returned the $64,000 to the insurer. The insurer then notified Bala that she could reinstate the policy with proof of insurability and repayment of about $6,000 in overdue premiums. The insurer informed Bala that she could pay the overdue premiums using the policy's cash value, but Bala now asserts that the Trustee informed her that he would prevent any such use of the cash value. Bala did not respond to the insurer's notice.[3]

In January 2009, the insurer sought to interplead the cash value of the policy in the bankruptcy case, deliver the funds to the bankruptcy court, and limit its involvement or future liability. Bala resisted, and the bankruptcy court permitted deposit of the funds. In January 2011, the Trustee filed an adversary proceeding to determine if the deposited funds from the insurer were property of the estate.

In the adversary proceeding, Bala and the Trustee filed cross motions for summary judgment. Arguments concerning the parties' respective rights to the funds relied in large part on the terms of the Split-Dollar Agreement, which provides as follows:

1. The undersigned (herein called "Assignor" [Bala]) hereby assigns, transfers and sets over to Racing Services, Inc. of Fargo, ND (hereinafter called "Assignee") to the extent of the total of any and all amounts heretofore or hereafter advanced by the Assignee to the Assignor [Bala] for the payment of premiums or a portion

---

[3]Regarding proof of insurability, there is no evidence of Bala's health condition in 2007, but she subsequently was diagnosed with cancer and claims to have suffered various stress-related medical issues prior to receiving her cancer diagnosis. Further, when Bala received the insurer's notice that she could reinstate the policy with proof of insurability and payment of overdue premiums, she had only recently obtained the reversal of her conviction.

of the premiums (herein called "Assignee's Interest") thereon, Policy No # 3909537 issued by The Company indicated above (herein called "Insurer") and any supplementary contracts issued in connection therewith (said policy and contracts being called herein the "Policy") upon the life of Susan Bala subject to all the terms and conditions of the Policy and to all superior liens, if any, which the insurer may have against the Policy. The Assignor [Bala] by this instrument agrees and the Assignee by acceptance of the assignment agrees to the conditions and provisions herein set forth.

2.   It is expressly agreed that only the following specific rights are included in this assignment and pass by virtue hereof to the Assignee and may be exercised solely by the Assignee:

   a.   The right to obtain, upon surrender of the policy by the Assignor [Bala], an amount of the cash surrender proceeds up to the amount of the Assignee's interest in the policy.

   b.   The right to collect the net proceeds of the policy when it becomes a claim by death or maturity up to the amount of the Assignee's Interest.

. . .

8.   If the agreement is terminated, the Assignee shall transfer its interest in the Policy to the Assignor [Bala] in exchange for an amount equal to the Assignee's interest, obtained by the Assignee upon the security of the policy.

(Interpretive Brackets Added). Paragraphs 3–7 of the Split-Dollar Agreement, not reproduced above, were ministerial in nature and did not expand the assignment of rights to Racing Services in any manner.[4]

---

[4]Paragraph 3 imposed on Racing Services the duty to pay premiums; Paragraph 4 indicated that Racing Services would not enjoy an increased interest in the policy if the insurer were to waive premiums; Paragraph 5 authorized the insurer to recognize Racing Services interest; Paragraph 6 represented that Bala was not subject to pending bankruptcy proceedings; and Paragraph 7 provided that premium notices

The fighting issues in the adversary proceeding below were (1) whether the limited assignment of rights related to *surrender by Bala* as set forth in Paragraph 2.a controlled (or whether a purported "surrender" of the policy by other persons or termination of the policy by other means could suffice to trigger the Paragraph 2.a rights for Racing Services); and (2) whether Paragraph 8 granted to Racing Services an independent right to force Bala to accept and pay for a return assignment of Racing Services's interest upon termination of the Split-Dollar Agreement (or whether Paragraph 8 merely imposed upon Racing Services a duty to reassign its interest to Bala if she elected to demand such a transfer).

The bankruptcy court found that the Split-Dollar Agreement was unambiguous and that the Trustee held the superior claim.  In reaching this conclusion, the court acknowledged that Bala had argued that she had not surrendered the policy and that the Trustee had conceded that Bala had not surrendered the policy.  Second, the court noted that both parties argued the insurer rather than Bala had surrendered the policy. Third, the court determined that Racing Services's right to obtain repayment of premiums from the policy's cash value under Paragraph 2.a could only arise if *Bala* surrendered the policy, and that because she did not surrender the policy, Racing Services and the Trustee did not have rights to the policy via Paragraph 2.a.

The bankruptcy court concluded, however, that Paragraph 8 created an independent right for Racing Services to receive a repayment of premiums and that, regardless of the inapplicability of Paragraph 2.a, Racing Services was entitled to repayment.  The bankruptcy court found that an earlier bankruptcy order had effected the termination of the Split-Dollar Agreement, thus triggering Paragraph 8.  The bankruptcy court reasoned that a failure to read Paragraph 8 as creating an independent right to repayment for Racing Services would render Paragraph 8 a nullity.

were to be sent to Racing Services.

Bala appealed to the BAP, and the BAP affirmed. The BAP held that the Split-Dollar Agreement's reference in Paragraph 2.a to the concept of surrender by Bala need not be read narrowly. The BAP stated, "We believe that [the insurer's] treatment of the policy as surrendered due to the forfeiture of Bala's rights in the order obtained by the United States is substantively the same as a surrender by Bala herself." In so holding, the BAP described the October 2006 preliminary order to substitute the policy as an asset for forfeiture as a final order of forfeiture and indicated that Bala's rights in the policy transferred to and vested with the DOJ at an earlier time, upon her commission of the offense. According to the BAP, because the DOJ held all of Bala's rights in the policy, its actions served as a qualifying surrender by Bala.

In the alternative, the BAP held that Racing Services held an independent right, rooted in Paragraph 8, to receive a repayment of its premiums. This alternative holding is essentially the same holding as set forth by the bankruptcy court. In reaching this conclusion, the BAP characterized the Split-Dollar Agreement's assignment of rights to Racing Services as a broad assignment of the policy.

Bala appeals.

II.    Discussion

"Contract interpretation, including whether a contract as written is ambiguous, is a matter of law, which we review de novo." Anderson v. Hess Corp., 649 F.3d 891, 896 (8th Cir. 2011). The parties agree that North Dakota law governs our contract interpretation in this case. "North Dakota statutes governing contract interpretation . . . provide: (1) the language of a contract governs its interpretation if the language is clear and unambiguous, see N.D. Cent. Code Ann. § 9–07–02; (2) courts are to interpret the contract as a whole to give effect to all of its provisions, see N.D. Cent. Code Ann. § 9–07–06; and (3) the words of a contract are to be given their ordinary

meaning, absent the parties' use of the words in a technical sense, see N.D. Cent. Code Ann. § 9–07–09." Id. at 897. And, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of this chapter." N.D. Cent. Code Ann. § 9-07-04.

As explained below, we conclude the plain language of the Split-Dollar Agreement limits Racing Services's rights in a manner that is dispositive in this case and that Bala, rather than the Trustee, holds the superior claim to the policy's cash value proceeds. In reaching this conclusion, we find it unnecessary to look beyond the written agreement to determine the parties' intent. We note this fact because Bala and the Trustee argued below and on appeal that various external sources of evidence demonstrated the parties' true intentions and were necessary to aid in our interpretation of the contract.

For example, Bala argued that the entire purpose of the Split-Dollar Agreement was to provide a bare minimum of rights to Racing Services merely to comply with then-extant IRS regulations or guidelines as necessary to ensure tax-favored treatment for Racing Services and Bala. Bala also argued that, at the time of contract formation, she was the sole employee of Racing Services, personally stood on both sides of the transaction, and necessarily intended that all terms be interpreted in her favor. Racing Services, on the other hand, argued that the parties to the contract had intended to grant to Racing Services a broad guarantee or entitlement to a full repayment of premiums. We need not assess the extrinsic evidence or these general arguments because, as already stated, we view the policy as unambiguous. Oxy USA, Inc. v. Hartford Ins. Grp., 58 F.3d 380, 381 (8th Cir. 1995) ("[A] contract is unambiguous [if] the parties' intentions can be ascertained from the writing alone.").

Paragraph 1 of the Split-Dollar Agreement defines in part Racing Services's interest in the insurance policy as being limited to the dollar amount of premiums paid by Racing Services. It also makes an assignment of the policy to Racing

Services "subject to all of the terms and conditions of the policy" and subject "to the conditions and provisions" of the Split-Dollar Agreement.

Paragraph 2 expressly and with quite strong language restricts the scope of the assignment to Racing Services set forth in Paragraph 1. The introductory portion of Paragraph 2 states, "It is expressly agreed that *only the following specific rights are included in this assignment and pass by virtue hereof to the Assignee* [Racing Services] and may be exercised solely by the Assignee." (Emphasis added). By expressly limiting the assignment to Racing Services to include only a set of specifically enumerated rights, the introductory portion of Paragraph 2 sets the stage for our interpretation of the Split-Dollar Agreement. Consequently, we may not begin our analysis with a presumption that the parties intended to grant to Racing Services more rights than the parties elected to set forth expressly. We also do not begin our analysis with an assumption that the parties may have intended a guarantee of repayment to Racing Services or any sort of broad assignment of rights or broad entitlement to repayment apart from what is enumerated. Such an assumption would ignore the introductory language of Paragraph 2 and, instead, rely only upon the assignment language of Paragraph 1. The assignment language of Paragraph 1, however, cannot be read in isolation.

Beneath the introductory language, Paragraph 2 has only two sub-parts, sub-parts a and b, setting forth the enumerated "specific rights." These two sub-parts confer separate and distinct rights upon Racing Services. Paragraph 2.a confers "[t]he right to obtain, upon surrender of the policy *by the Assignor* [Bala], an amount of the cash surrender proceeds up to the amount of the Assignee's interest in the policy." (Emphasis added). Paragraph 2.b confers "[t]he right to collect the net proceeds of the policy when it becomes a claim by death or maturity up to the amount of the Assignee's interest."[5]

_____

[5]It is undisputed that sub-part b does not apply to the present facts.

By specifically providing for rights only in the event of a surrender by Bala, and not for a surrender generally or for some other type of triggering event (such as termination by a court, the DOJ, the insurer, or the Trustee for the employer), the most natural reading of Paragraph 2.a makes an act of surrender by Bala a necessary trigger for Racing Services to realize the right assigned in Paragraph 2.a. This is consistent with North Dakota's requirements that we interpret the language of the contract according to its natural meaning, give meaning to all the terms of a contract, and interpret the individual terms of the contract in light of the contract as a whole. Anderson, 649 F.3d at 896–97. For example, we know that in Paragraph 8 of the Split-Dollar Agreement, the parties chose to reference the act of termination without specifying an actor. This demonstrates that where the parties sought to reference termination as contrasted with surrender, they did so expressly. This also means that where the parties sought to reference a triggering action generally and without reference to a specific actor, they demonstrated the ability to do so. Given this contra-example in the same short document—the Split-Dollar Agreement contains only eight paragraphs and is one page long—we reject the argument that we may read the phrase "surrender by the Assignor" as broadly encompassing the acts of others such as the DOJ, the Trustee, or the insurer or as generically referencing events other than a "surrender" of the policy.[6]

The question remains, however, whether Paragraph 8 serves as an independent grant of rights to Racing Services. Paragraph 8 provides, "If the agreement [the Split-Dollar Agreement] is terminated, the Assignee [Racing Services] shall transfer its interest in the Policy to the Assignor [Bala] in exchange for an amount equal to the Assignee's interest . . . ." Standing alone and read in isolation, Paragraph 8 arguably could be subject to two possible interpretations. First, Paragraph 8 could be

_____

[6]Although we do not decide the present case on a theory of waiver, we note that this interpretation is also consistent with the fact that the bankruptcy court found Paragraph 2.a did not apply because Bala and the Trustee had agreed that she did not surrender the policy.

-11-

interpreted as imposing upon Bala no actual duty to transfer funds to Racing Services and as granting to Racing Services no actual right to force a transfer. Under this first interpretation, the word "shall" in Paragraph 8 applies only to Racing Services and imposes upon Racing Services a duty to assign its interest back to Bala in exchange for a repayment of premiums if the Split-Dollar Agreement is terminated *and if* Bala elects to demand such an assignment. Second, Paragraph 8 could be interpreted as using the word "shall" to apply to Bala as well as Racing Services such that Paragraph 8 creates reciprocal rights and imposes reciprocal duties that either party may enforce.

To determine which interpretation is correct, and to determine whether an actual ambiguity exists, we read Paragraph 8 in the context of the entire agreement, using "[e]ach clause . . . to help interpret the others." N.D. Cent. Code Ann. § 9-07-06. See also Spagnolia v. Monasky, 660 N.W.2d 223, 228 (N.D. 2003) ("'The intention of the parties to a contract must be gathered from the entire instrument and not from isolated clauses.'" (quoting Vanderhoof v. Gravel Prods., Inc., 404 N.W.2d 485, 491 (N.D.1987))). Placing Paragraph 8 in context, it becomes apparent that Paragraph 8 should not be read as a grant of rights to Racing Services. The parties elected to place the limited set of specifically enumerated rights assigned to Racing Services within Paragraph 2 itself and to fashion Paragraphs 3–8 as fully contained, separate statements apart from the introductory language of Paragraph 2. Read otherwise, it would be necessary to extend the introductory phrase of Paragraph 2, "only the following specific rights are included in this assignment," to cover the entirety of Paragraphs 3–8.

Such a construction simply would not make sense. Paragraphs 2.a and 2.b clearly and unequivocally grant rights to Racing Services. Paragraphs 3–7 do not. In fact Paragraph 3 imposes on Racing Services the duty to pay premiums, and Paragraph 4 specifically identifies rights that Racing Services does not possess. The introductory language of Paragraph 2 therefore, would make no sense as applied to Paragraphs 3–7. To believe that the drafters intended the introductory language of

Paragraph 2 to apply not only to Paragraph 2.a and 2.b, but also to Paragraph 8, we would have to believe that the drafters intended an unnatural construction in which the introductory language of Paragraph 2 hopscotched Paragraphs 3–7 to reach Paragraph 8.

We find no principled support for such an interpretation. Importantly, because one of the two possible constructions of Paragraph 8 avoids the issue, we adopt that construction: the word "shall" in Paragraph 8 applies only to Racing Services and not to Bala. Only this interpretation accords actual meaning to the limiting, introductory language of Paragraph 2 and cabins the grant of rights to Paragraph 2. We therefore conclude that Paragraph 8 is not a source of rights for Racing Services, but rather, that it imposes upon Racing Services a duty that arises at Bala's option.

The Trustee argues that such an interpretation renders Paragraph 8 a nullity because Bala would have no incentive to force such an exchange. We disagree. Suffice it say, no party alleges that the contract drafters envisioned the bizarre course of events that led to the liquidation of Bala's policy and, eventually, to this appeal. In the ordinary course of events, as likely envisioned by the drafters, the Split-Dollar Agreement could have been terminated by breach or by Bala's departure from employment with Racing Services. In the event of a termination through breach, the Trustee's proposed interpretation would serve to reward Racing Services for its breach by granting access to policy funds it otherwise could not reach. We find nothing in the Split-Dollar Agreement viewed in its entirety to suggest the parties intended to vest such power with Racing Services or otherwise reward Racing Services for a potential breach. In the event of a termination due to Bala's departure from employment with Racing Services, it is easy to envision situations when she would choose to buy out the Assignee's interest and situations when she would not.

For example, upon ending employment in the normal course of events, Bala would enjoy the ability to remain insured by paying premiums through the automatic

-13-

loan provisions, or through any other means. If Bala were otherwise not able to procure other insurance (if at the time of such a departure, her health were poor or she was otherwise uninsurable) she might have a strong incentive to keep her policy in place. If on the other hand, she did not face any difficulties in procuring additional insurance or if she obtained employment with an entity somehow adverse to Racing Services, she might wish to sever entirely her connection to the company, and termination of the Split-Dollar Agreement could achieve that. Further, the Split-Dollar Agreement was formed at policy inception and the relative values of the death benefit, the accrued cash value, and the total premiums paid by Racing Services might make the likelihood of Bala exercising her various rights wax and wane over time. In other words, we cannot presume that the values of the various interests as they existed at the time of policy liquidation are helpful interpretive tools for understanding Paragraph 8.

Further, we view the underlying argument that Paragraph 8 would be a nullity if not interpreted in the Trustee's preferred fashion is, at its heart, an assertion that the contrary interpretation would lead to absurd results. Namely, because the Trustee believes Racing Services obtained a broad assignment of rights akin to a guarantee of repayment, the Trustee believes it would be absurd to allow Bala to enjoy the value of the policy without Racing Services first receiving full repayment. The policy itself, however, clearly permits such a possibility. Under the general loan provision as well as under the automatic premium payment loan provision, Bala could have allowed the cash value to dwindle to zero. Although the Trustee insisted at oral argument that Bala could not borrow from the policy, the policy plainly provides for such loans, and the Trustee has identified nothing in the Split-Dollar Agreement or in the policy that would have empowered Racing Services to interfere had Bala elected to take policy loans and leave nothing for Racing Services (other than the Paragraph 2.b claim to proceeds upon her death). Given the presence of the loan provisions in the policy (which is incorporated into the Split-Dollar Agreement), we

-14-

simply cannot adopt an interpretation that is premised on the purported extra-textual intent to grant broad rights or guarantees to Racing Services.

Because Paragraph 8 does not grant any rights to Racing Services to demand that Bala buy out its interest, the Trustee cannot claim that Paragraph 8 entitles it to retain the policy's liquidation proceeds.

Finally, to the extent the Trustee urges us to examine the "equities" of this case and treat Bala's failure to reinstate the policy as an act of surrender, we note two particularly clear points. First, the October 2006 order to substitute the policy for forfeiture was not akin to a forfeiture provision in an original criminal judgment. Rather, the order granted the DOJ authority to "seize the . . . property and maintain custody and control of the property and inspect and appraise the property pending the entry of a Final Order of Forfeiture." The October 2006 Order also required the DOJ to follow notice requirements and to avoid disposition of the property until expiration of the notice period or until resolution of competing claims. The DOJ could not obtain title to the property until expiration of such period or resolution of such claims. See, e.g., Fed. R. Crim. Pro. 32.2(b)(3) (listing the limited authority granted to the DOJ through a preliminary order). In short, the DOJ did not step into Bala's shoes and obtain full rights to the policy when the district court entered the October 2006 order.

Second, even before her criminal conviction was overturned, the district court raised the issue of an absence of notice, calling into doubt the validity of that order and clearly suspending any claims the DOJ might have been making to ownership over the Policy. We note this fact because, although the equities of the entire history of this matter may not be clear, it is clear to our court that the policy was terminated in an inequitable manner without court approval at the apparent behest of the DOJ which, at the time, had the duty to preserve the policy but not the right to cancel it. Notwithstanding Bala's presently recognized right to obtain the policy's liquidation

proceeds, the actions of the terminating party deprived her of her insurance death benefit.

For this reason, and because the Trustee has presented no evidence demonstrating that Bala could have demonstrated insurability, we reject the argument that the purported "equities" of this case require that we deem Bala's failure to reinstate the policy as an act of surrender.

III. Conclusion

We reverse the judgment of the BAP and remand for further proceedings consistent with this opinion.

RILEY, Chief Judge, concurring in the judgment.

This is an unusual case with unusual facts. A flawed forfeiture prosecution by the U.S. Attorney for the District of North Dakota erroneously altered the relationship between Bala and Racing Services's bankruptcy estate regarding Bala's life insurance policy. Though not faultless, neither Bala nor the bankruptcy trustee are truly to blame for this predicament. The trustee, as he should, seeks to maximize the bankruptcy estate. Bala understandably seeks to return to the position nearest the one she held before the forfeiture proceedings.

The difficult question at this point is: Who has a superior claim to the cash proceeds of Bala's insurance policy under the unusual circumstances of this case? Whose position will improve at the expense of the other? For slightly different reasons, the bankruptcy court and the Bankruptcy Appellate Panel decided the bankruptcy estate should recover the cash proceeds to reimburse the premiums Racing Services paid. Although their rationales are not without merit, I am unable to agree with their conclusions. As the majority explains, the plain language of

-16-

paragraph 2.a of the collateral assignment agreement gave Racing Services limited rights in the "cash surrender proceeds" of the policy only "upon surrender of the policy *by the Assignor* [Bala]." (Emphasis added). Because that condition was not satisfied on the unusual facts of this case under North Dakota law, the bankruptcy estate never obtained rights to the policy proceeds, and Bala has the superior claim to the liquidated cash value of her policy. Based on the plain language of the assignment agreement, I concur in the decision to reverse the grant of summary judgment to the trustee.

_____

-17-