# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1683

_____

Macquarie Bank Limited

*Plaintiff - Appellant*

Macquarie Americas Corp.

*Plaintiff*

v.

Bradley D. Knickel; LexMac Energy, L.P.; Lexar Energy, Inc.; Novus Operating
Company, L.P.

*Defendants - Appellees*

KHL, Inc.; Mineral Land Services, Inc.

*Defendants*

v.

Macquarie Barnett, LLC

*Third Party Defendant - Appellant*

_____

No. 14-1684

_____

Macquarie Bank Limited

*Plaintiff - Appellee*

Macquarie Americas Corp.

*Plaintiff*

v.

LexMac Energy, L.P.; Lexar Energy, Inc.; Novus Operating Company, L.P.

*Defendants - Appellants*

Bradley D. Knickel; KHL, Inc.; Mineral Land Services, Inc.

*Defendant*s

v.

Macquarie Barnett, LLC

*Third Party Defendant - Appellee*

————————

Appeals from United States District Court
for the District of North Dakota - Bismarck

————————

Submitted: March 10, 2015
Filed: July 17, 2015

————————

Before WOLLMAN, BEAM, and LOKEN, Circuit Judges.

————————

WOLLMAN, Circuit Judge.

Macquarie Bank Limited (Macquarie Bank) and a subsidiary brought suit against LexMac Energy, L.P. (LexMac); Novus Operating Company, L.P. (Novus); Lexar Energy, Inc. (Lexar); and Bradley Knickel, who controls all three companies (collectively, Lexar Group). Macquarie Bank and the subsidiary alleged claims of deceit, fraud, and promissory estoppel, among others, and also alleged that the corporate veil of the three companies should be pierced to hold Knickel personally liable. In their answer, LexMac, Novus, and Lexar sought declaratory judgment and alleged claims of misappropriation of trade secrets and unlawful interference with business, among others, against Macquarie Bank and third-party defendant Macquarie Barnett, LLC (Macquarie LLC), another subsidiary of Macquarie Bank. The district court[1] disposed of all claims before trial except LexMac and Novus's misappropriation claim. After a bench trial, the district court found that Macquarie Bank and Macquarie LLC had misappropriated trade secrets, and it awarded damages, prejudgment interest, and attorney's fees.

Macquarie Bank and Macquarie LLC (collectively, Macquarie) appeal. Macquarie Bank argues that its claims of deceit, fraud, and promissory estoppel should have survived summary judgment. Macquarie argues that there was insufficient evidence to establish that it had misappropriated trade secrets; that LexMac and Novus were not entitled to attorney's fees; and that the district court erred in calculating damages. Lexar Group filed a collective cross-appeal. Lexar argues that the district court's grant of summary judgment to Macquarie on Lexar's claims was procedurally and substantively improper. LexMac and Novus argue that the district court erred in calculating damages. We affirm.

---

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

# I. Background

Knickel approached Macquarie Bank in 2004 about obtaining a loan for Lexar to develop certain oil and gas leases in North Dakota. During the course of negotiations, Knickel provided Macquarie Bank with certain confidential information about the leased acreage that he had assembled over the course of ten years. Ultimately, the parties agreed that Lexar would assign the leases and its interest in the confidential information to LexMac and Novus. Macquarie Bank then entered into two agreements with LexMac and Novus: the Senior First Lien Secured Credit Agreement (Credit Agreement) and the Mortgage, Assignment of Production, Security Agreement and Financing Statement (Mortgage). Lexar was not a party to the Credit Agreement or the Mortgage.

As collateral for its loan, Macquarie Bank acquired a mortgage lien and perfected security interest in the oil and gas leases and in any extensions or renewals of the leases. The confidential information that Lexar had assigned to LexMac and Novus—reserves reports on the acreage, seismic data, and geologic maps—also served as collateral. LexMac and Novus also granted a royalty interest from any oil and gas production of the leased acreage to a subsidiary of Macquarie Bank.

LexMac and Novus encountered problems developing the leases to produce oil and gas and defaulted on the loan. They completed only one well, which never became fully operational. In July 2007, Macquarie Bank issued a Notice of Default and Intent to Accelerate. Because of the lack of development or production, many of the leases serving as collateral were set to expire in the fall of 2007. Accordingly, Macquarie Bank began discussions with Knickel to ensure that the leases were renewed. According to Knickel, he agreed to renew only the leases that included automatic extension provisions. Macquarie Bank claims that Knickel assured it that he would renew all of the leases serving as collateral in the names of LexMac and Novus. Knickel renewed the leases that included automatic extension provisions in

-4-

the names of LexMac and Novus. Upon the expiration of the leases without automatic extension provisions, however, Knickel entered into new leases in the name of Lexar alone. Lexar intended to develop the leases together with LexMac and Novus, since LexMac and Novus owned the confidential information about the acreage.

In October 2007, Macquarie Bank filed an action to foreclose on the leases. Judgment was entered in February 2008, declaring that LexMac and Novus's interest in the leases pledged as collateral would be sold to satisfy the debt owed to Macquarie Bank: $5,296,252.29, plus interest accruing from October 18, 2007. The judgment made no mention of the confidential information that served as collateral. Macquarie Bank assigned the judgment to Macquarie LLC, and in April 2008, Macquarie LLC purchased the leases at a sheriff's sale for a credit bid of $5.4 million. It did not seek to recover any deficiency resulting from the sale.

Most of the collateral leases had already expired by the time Macquarie LLC purchased them at the sheriff's sale, and the acreage associated with those leases was being leased by Lexar. In May 2008, Macquarie Bank filed a "Notice of Lis Pendens" on Lexar's leases of acreage associated with the expired collateral leases, seeking to establish that Lexar's leases were encumbered by the royalty interest previously granted by LexMac and Novus to Macquarie Bank's subsidiary (the district court eventually held that they were). Macquarie LLC also top leased Lexar's acreage, meaning that Macquarie LLC's leases would go into effect only if and when Lexar's leases expired because of lack of development or production.[2] Macquarie LLC also leased approximately 177 acres in the immediate area that had never been pledged as collateral, incurring $845,055 in leasing costs.

---

[2]Oil and gas leases expire after a set term, unless drilling or oil and gas production has started on the lease, in which case the lease will remain in effect as long as it is producing oil or gas.

Lexar's leases expired as a result of its inability to develop the acreage. Macquarie LLC's top leases then went into effect. Macquarie LLC hired an oil and gas consulting company to evaluate the resources on the leased acreage and prepare a reserves report, which would help Macquarie LLC find a buyer for the leases. To facilitate the evaluation, Macquarie LLC gave LexMac and Novus's seismic data and geologic maps on the leased acreage to the consulting company. Around the same time, Macquarie LLC also hired a management company to help find a buyer for the leases and provided the company with LexMac and Novus's geologic maps. The management company sought bids from several interested parties and ultimately obtained a bid of $1,600 per acre from Kodiak Oil and Gas (Kodiak). The management company asked other interested parties if they would increase their bids, but none were willing to top Kodiak's bid. Macquarie LLC sold its leases to Kodiak for $8.5 million and paid the management company $820,000 for its work.

Macquarie Bank and its subsidiary initiated this lawsuit in 2008, two years prior to Macquarie LLC's ultimate sale of the leases. Lexar Group counterclaimed against Macquarie Bank and brought claims against third-party defendant Macquarie LLC. The parties filed cross-motions for summary judgment in October 2009. The district court ruled on the motions in June 2010, granting summary judgment to Lexar Group on all of Macquarie Bank's claims and allowing Lexar Group's claims of misappropriation and unlawful interference to proceed. In mid-October 2012, a week before trial was scheduled to begin, Macquarie filed a "Pretrial Memorandum," arguing that the North Dakota Uniform Trade Secrets Act preempted Lexar Group's remaining tort claims and that Lexar would not be able to survive a directed verdict because it did not own the trade secrets at issue. After the pretrial memorandum was filed, the trial was delayed and Lexar Group never responded to the memorandum. The district court later granted summary judgment to Macquarie on LexMac and Novus's claim of unlawful interference, but allowed their misappropriation claim to proceed. The district court also granted summary judgment to Macquarie on Lexar's misappropriation and unlawful-interference claims.

-6-

After a four-day bench trial on LexMac and Novus's only remaining claim—that of misappropriation—the district court found that Macquarie had misappropriated trade secrets. It awarded LexMac and Novus $1,434,945 in unjust-enrichment damages, $59,736 in actual-loss damages, $352,674 in prejudgment interest, $38,674.51 in costs, and $471,828.84 in attorney's fees and expenses.

## II. Obligations Under the Credit Agreement and the Mortgage

Macquarie Bank argues that the district court erred when it determined in its summary-judgment order that neither the Credit Agreement nor the Mortgage imposed a duty on LexMac and Novus to preserve the expiring leases as collateral. The district court addressed this argument in the context of Lexar Group's action for declaratory judgment. It is not entirely clear what remedy Macquarie Bank seeks if we were to reverse the district court's interpretation of the contracts, but it suggests that a reversal would affect its liability for misappropriation as well as the damages determination. Additionally, whether LexMac and Novus had a contractual duty to preserve the leases as collateral is relevant to Macquarie Bank's deceit claim against Lexar Group. Accordingly, we will address the argument, reviewing the district court's interpretation of the contracts *de novo*. In re Racing Servs., Inc., 744 F.3d 543, 549 (8th Cir. 2014).

Macquarie Bank relies on sections 3.1(c), 7.4(c), and 8.1 of the Credit Agreement and sections 1.1 and 3.2(c) of the Mortgage to argue that the contracts required LexMac and Novus to renew the expired leases. Section 3.1(c) of the Credit Agreement provided:

> [LexMac and Novus] will, upon request, execute and deliver to [Macquarie Bank] any and all documents necessary or desirable, in the reasonable opinion of [Macquarie Bank], to create, perfect, maintain and preserve the priority of [Macquarie Bank's] security interests in and mortgage liens on the Collateral and the other Personal Property . . . .

-7-

Section 7.4(c) of the Credit Agreement stated that LexMac and Novus shall not "sell, transfer, assign or grant any Person an option to acquire any of its assets . . . or take any similar action except for the sale of production or inventory in the ordinary course of [LexMac and Novus's] business." Section 8.1 of the Credit Agreement provided that "[u]ntil the Obligations are repaid in full, [LexMac and Novus], at [their] own expense, shall do all things and shall deliver all instruments requested by [Macquarie Bank] to create, perfect, protect or continue any security interest, mortgage or lien granted or created under this Agreement." Section 1.1 of the Mortgage provided:

> The Mortgaged Properties are to remain so specially mortgaged, affected and hypothecated unto and in favor of [Macquarie Bank] until the full and final payment or discharge of the Secured Indebtedness, and [LexMac and Novus are] herein and hereby bound and obligated not to sell or alienate the Mortgaged Properties to the prejudice the [sic] terms and conditions of this Mortgage or any of the rights of [Macquarie Bank] hereunder.

Finally, section 3.2(c) of the Mortgage provided:

> So long as the Secured Indebtedness or any part thereof remain unpaid, [LexMac and Novus] covenant[] and agree[] with [Macquarie Bank] . . . . [t]hat [LexMac and Novus] will cause the oil, gas or oil and gas . . . leases included in or relating to the Mortgaged Properties (herein called "Subject Leases") to be maintained and operated for the production of oil or gas in a good and workmanlike manner and in accordance with sound field practices and all applicable federal, state and local laws, rules and regulations and will not allow any of Subject Leases to be surrendered, abandoned, or terminated or impaired in any manner.

The provisions set forth above did not require LexMac and Novus to renew the expired collateral leases. Section 3.1(c) required LexMac and Novus to provide

Macquarie Bank with documents it requested. Section 7.4(c) of the Credit Agreement and sections 1.1 and 3.2(c) of the Mortgage prohibited LexMac and Novus from selling, transferring, assigning, alienating, surrendering, abandoning, terminating, or impairing the leases serving as collateral, but did not prohibit LexMac and Novus from allowing the leases to expire naturally because of lack of production (particularly in light of the fact that there is no evidence of bad faith). Similarly, section 8.1 of the Credit Agreement required LexMac and Novus to "do all things . . . requested by [Macquarie Bank] to create, perfect, protect or continue any security interest" in the leases. When read in context, this provision did not require LexMac and Novus to renew the leases when they naturally came to an end; rather, section 3.2(c) prohibited LexMac and Novus from terminating their interest in the leases before they expired.

We reject Macquarie Bank's argument that the Lexar leases constituted extensions or renewals of the expired LexMac and Novus leases and thus served as collateral under the Credit Agreement. The Credit Agreement contains a provision stating that it is to be interpreted under Texas law. We apply the law of the forum state, North Dakota, to determine whether the contractual choice-of-law provision in the contract governs. John T. Jones Constr. Co. v. Hoot Gen. Constr. Co., 613 F.3d 778, 782 (8th Cir. 2010). We believe that the North Dakota Supreme Court would resolve this dispute under Texas law, as called for by the Credit Agreement. See Snortland v. Larson, 364 N.W.2d 67, 68-69 (N.D. 1985) (citing with approval Restatement (Second) of Conflict of Laws § 187 (1971)); Am. Hardware Mut. Ins. Co. v. Dairyland Ins. Co., 304 N.W.2d 687, 689 n.1 (N.D. 1981) (same); Restatement (Second) of Conflict of Laws § 187(1) (1971) ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.").

The Credit Agreement defines collateral to include the leases and any extensions or renewals of the leases. Under Texas law, "[a]n extension . . . generally means the prolongation or continuation of the term of the existing lease." Sunac Petrol. Corp. v. Parkes, 416 S.W.2d 798, 802 (Tex. 1967). Because LexMac and Novus's leases had expired before Lexar acquired the new leases, the Lexar leases did not constitute extensions or renewals. Cf. id. at 802-03 (holding that a new lease entered into by the same party that had previously held a lease was not a renewal or extension because the new lease was entered into "under different circumstances, for a new consideration, upon different terms, and over a year after the expiration of the old lease"). Thus, because LexMac and Novus were not contractually obligated to preserve the leases as collateral, the Lexar leases did not serve as collateral under the contract.

### III. Macquarie Bank's Claims on Summary Judgment

Macquarie Bank argues that the district court should not have granted summary judgment to Lexar Group on Macquarie Bank's claims of deceit, fraud, and promissory estoppel. We review the district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party. Jetton v. McDonnell Douglas Corp., 121 F.3d 423, 424 (8th Cir. 1997).

### A. Deceit and Fraud

Under North Dakota law, "the same conduct, a promise made without any intention of performing, may constitute both deceit and fraud." Erickson v. Brown, 747 N.W.2d 34, 44 (N.D. 2008); see also N.D. Cent. Code §§ 9-03-08(4), 9-10-02(4). Such a promise constitutes "deceit if there is no contract between the parties, or fraud if there is a contract and one party's apparent consent to the contract is obtained as a result of that promise." Delzer v. United Bank of Bismarck, 527 N.W.2d 650, 656 n.4 (N.D. 1995). "[P]roof of actual damage proximately caused by the

misrepresentation or nondisclosure is an essential element of a tort action for . . . deceit." Schneider v. Schaaf, 603 N.W.2d 869, 874 (N.D. 1999). Summary judgment is appropriate if the plaintiff has not offered sufficient proof of actual damages caused by the deceitful act. See id. at 875-76. Deceit and fraud claims must be proved by clear and convincing evidence, and "it is appropriate to consider the quantum of proof necessary to support liability" when determining the propriety of summary judgment in a deceit or fraud case. Erickson, 747 N.W.2d at 45, 47.

Macquarie Bank contends that when leases serving as collateral for Macquarie Bank's loan to LexMac and Novus were set to expire, Knickel orally promised to renew them. Instead, Knickel leased the acreage in the name of Lexar so that the new leases would not serve as collateral. Macquarie Bank does not dispute the district court's holding that Knickel's oral promises did not rise to the level of a contract, which meant that they could not constitute fraud under North Dakota law. The fact that Knickel's oral promises are not enforceable as a contract, however, does not preclude Macquarie Bank's deceit claim. See Erickson, 747 N.W.2d at 48.

Macquarie Bank argues that in September 2007, before the leases serving as collateral expired, its lease brokers were poised to re-lease the acreage in the names of LexMac and Novus and thereby preserve the leases as collateral. Because of Knickel's promise to renew the leases, however, Macquarie Bank instructed its lease brokers not to act. Had they done so, Macquarie Bank contends that the leases would have been renewed and preserved as collateral and Macquarie LLC would have acquired them at the foreclosure sale in April 2008. Instead, Macquarie LLC was required to expend funds to top lease Lexar's leases, a consequence that Macquarie Bank argues resulted from Knickel's deceit.

Macquarie Bank cannot establish that it was damaged as a result of Knickel's promise because the lease brokers would not have been able to renew the leases in the names of LexMac and Novus over Knickel's objections. Macquarie Bank's argument

-11-

is premised on its belief that the Mortgage and Credit Agreement required LexMac and Novus to preserve the leases as collateral, but as discussed above, LexMac and Novus were under no such obligation. Even if Knickel had been forthcoming about his intentions to lease the acreage in the name of Lexar, there was nothing that Macquarie Bank or its lease brokers could have done to compel him to renew the leases in the names of LexMac and Novus. Accordingly, the district court did not err in granting summary judgment against Macquarie Bank on its claims of deceit and fraud.

## B. Promissory Estoppel

Macquarie Bank's claim of promissory estoppel arises from the same facts as its deceit and fraud claims. To establish promissory estoppel under North Dakota law, Macquarie Bank must show "a substantial change in the promisee's position through action or forbearance" caused by the promise. Dalan v. Paracelsus Healthcare Corp. of N.D., Inc., 640 N.W.2d 726, 731-32 (N.D. 2002). Macquarie Bank argues that it changed its position as a result of Knickel's promise by instructing its lease brokers, who were poised to maintain the collateral leases, not to act. As discussed above, however, there is nothing that Macquarie Bank's lease brokers could have done to require Knickel to renew the leases in the names of LexMac and Novus, and thus the district court properly granted summary judgment to the defendants on Macquarie Bank's promissory-estoppel claim.[3]

---

[3]Macquarie Bank also argues that the district court erred when it determined that there was insufficient evidence to justify piercing the corporate veil. "[T]he corporate veil may be pierced" when certain factors are present to hold "the officers and directors of a corporation . . . liable for the ordinary debts of a corporation." Coughlin Constr. Co. v. Nu-Tec Indus., Inc., 755 N.W.2d 867, 873 (N.D. 2008). Because we affirm the district court's grant of summary judgment to Lexar Group on Macquarie Bank's claims, there is no claim against LexMac, Novus, or Lexar on which Knickel could be held liable.

-12-

## IV. Lexar's Claims on Summary Judgment

On cross-appeal, Lexar argues that the district court erred in granting summary judgment to Macquarie on Lexar's claims of unlawful interference with business and misappropriation of trade secrets.

Lexar first argues that the district court's grant of summary judgment to Macquarie was procedurally improper. In 2009, Macquarie filed a motion for summary judgment, arguing that Lexar Group's claim of unlawful interference failed because Lexar Group had failed to identify a business relationship or expectancy with which Macquarie had interfered. Macquarie did not distinguish Lexar from LexMac and Novus, and the district court did not analyze Lexar's claims separately from LexMac and Novus's when it denied the motion. Macquarie argued for the first time in its mid-October 2012 pretrial memorandum that Lexar's claims should be analyzed separately from LexMac and Novus's claims because Lexar was not a party to the Mortgage or Credit Agreement and it did not own the trade secrets. At its October 16, 2012, pretrial conference, the district court told Lexar that it did not think "Lexar should . . . be part of the entities that ha[ve] a claim for misappropriation" and asked Lexar how much time it needed to find support for the position that "Lexar does, indeed, have a valid claim for misappropriation of a trade secret in light of the fact that they're not anywhere on any loan documents, credit agreements, mortgages or anything else." Lexar responded that it would file something within a few days. Trial was delayed, and Lexar did not file a response. A month later, the district court granted summary judgment to Macquarie on Lexar's unlawful-interference and misappropriation claims. With regard to the claim of unlawful interference, the district court found that Lexar had not identified a business relationship or expectancy with which Macquarie had interfered, an issue that Macquarie had raised in its 2009 motion.

Lexar argues that the district court granted summary judgment *sua sponte*, in violation of Federal Rule of Civil Procedure 56. "After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3); see also Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."). The district court placed Lexar on notice during the pretrial conference that it might dismiss Lexar's misappropriation claim, see Hubbard v. Parker, 994 F.2d 529, 531 (8th Cir. 1993), and thus it did not err in proceeding as it did.

Lexar also argues that the district court failed to provide notice that it would reconsider Macquarie's 2009 motion for summary judgment on the claim of unlawful interference. Rule 56, however, did not require the district court to do so, because Macquarie's 2009 motion for summary judgment addressed the precise issue ruled on by the district court, and Lexar had an opportunity to respond to the motion. Although the district court initially denied summary judgment, it was free to reconsider its ruling, see Mosley v. City of Northwoods, Mo., 415 F.3d 908, 911 (8th Cir. 2005), and thus it did not err in granting summary judgment to Macquarie on Lexar's claims.

We turn, then, to the merits of Lexar's claims of misappropriation and unlawful interference.

## A. Misappropriation of Trade Secrets

The district court granted summary judgment to Macquarie on Lexar's misappropriation claim because it found that Lexar did not own or have any interest in the trade secrets when the misappropriation occurred. On appeal, Lexar does not

contest the district court's characterization of the facts. It instead contends that its misappropriation claim should have been allowed to proceed to trial because it initially provided some of the trade-secret information to Macquarie Bank and had a business plan with LexMac and Novus to use the information to develop Lexar's leases. We decline to decide whether ownership is an element of a misappropriation claim under the North Dakota Uniform Trade Secrets Act, as Macquarie argues. Compare DTM Research, L.L.C. v. AT & T Corp., 245 F.3d 327, 332 (4th Cir. 2001) (holding that under the Maryland Uniform Trade Secrets Act, "fee simple" ownership is not an element of a misappropriation claim), with Sargent Fletcher, Inc. v. Able Corp., 3 Cal. Rptr. 3d 279, 283 (Cal. Ct. App. 2008) (stating that under the California Uniform Trade Secrets Act, an element of a misappropriation claim is that "the plaintiff owned a trade secret").

We hold instead that Lexar's misappropriation claim fails because "[w]henever more than one person is entitled to trade secret protection with respect to the same information, only that one from whom misappropriation occurred is entitled to a remedy." Uniform Trade Secrets Act § 3 cmt. (2005). That Lexar had a business plan with LexMac and Novus to develop the leases using the trade secrets has no bearing on whether Macquarie misappropriated the trade secrets from Lexar. Shortly after providing some of the trade secrets to Macquarie Bank, Lexar assigned all of its interest in the trade secrets to LexMac and Novus. In turn, LexMac and Novus granted Macquarie Bank the nonexclusive right to use the trade secrets, including the information originally provided by Lexar, for certain purposes under the Credit Agreement and the Mortgage. Macquarie Bank used and disclosed the trade secrets in a way that exceeded the scope of LexMac and Novus's consent, as discussed more fully below. This constituted misappropriation, the definition of which includes "[d]isclosure or use of a trade secret of another without express or implied consent by a person who" knew or had reason to know, at the time of the disclosure or use, that the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." N.D. Cent. Code § 47-25.1-01(2). The

-15-

misappropriation occurred only from LexMac and Novus, not Lexar. Accordingly, the district court properly granted summary judgment to Macquarie on Lexar's misappropriation claim.

## B. Unlawful Interference

Under North Dakota law, a claim for unlawful interference with business requires proof of "an independently tortious or otherwise unlawful act of interference by the interferer" that "caused the harm sustained." Trade 'N Post, L.L.C. v. World Duty Free Ams., Inc., 628 N.W.2d 707, 717 (N.D. 2001). Lexar argues that it had a business plan to develop its leases using LexMac and Novus's trade secrets, but was prevented from doing so by Macquarie's misappropriation. Even if Macquarie's misappropriation constituted an "unlawful interference," however, the North Dakota Uniform Trade Secrets Act "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." N.D. Cent. Code § 47-25.1-07(1). Lexar's claim is based solely on Macquarie's misappropriation. Essentially, Lexar's unlawful-interference claim constitutes an attempt to circumvent the North Dakota Trade Secrets Act's preclusion of a misappropriation claim and is consequently displaced.

## V. LexMac and Novus's Misappropriation Claim

Macquarie argues that the seismic data, geologic maps, and reserves reports that LexMac and Novus provided to Macquarie Bank to obtain the loan cannot constitute trade secrets under North Dakota law. Macquarie also argues that the district court erred in concluding that Macquarie had misappropriated the information. We review the district court's factual findings for clear error and its legal conclusions *de novo*. Eckert v. Titan Tire Corp., 514 F.3d 801, 804 (8th Cir. 2008).

## A. Trade Secret

Under North Dakota law, a trade secret is defined as information that (a) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (b) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.D. Cent. Code § 47-25.1-01(4). Macquarie does not dispute that there were reasonable efforts to keep the information secret. Macquarie argues only that the information had no economic value because neither Lexar Group nor Macquarie drilled successfully on the leased acreage. But value is not assessed using hindsight. The information had value because it was used to determine the development potential of the leases. Macquarie also derived actual economic value from the information when Macquarie used it to solicit bids for the leases. Accordingly, the district court did not err in determining that the information constituted a trade secret.

## B. Misappropriation

Under North Dakota law, the definition of misappropriation includes "[d]isclosure or use of a trade secret of another without express or implied consent by a person who" knew or had reason to know, at the time of the disclosure or use, that the trade secret was either "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" or "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." N.D. Cent. Code § 47-25.1-01(2). Macquarie argues that because it did not use or disclose trade secrets, it did not misappropriate them, and that if it did, it had the express consent of LexMac and Novus to do so.

## 1. Disclosure or Use

Macquarie argues that the district court erred in finding that it used or disclosed the trade secrets, because, (a) Macquarie Bank disclosed the trade secrets only to Macquarie LLC and they should be treated as one entity, and (b) Macquarie did not use the trade secrets to top lease the acreage. The district court, however, found that Macquarie Bank provided the trade secrets to Macquarie LLC, an entity that in turn provided the information to an oil and gas consulting company to prepare a new reserves report, which ultimately helped Macquarie LLC sell the leases. The district court also found that Macquarie LLC provided the trade secrets to a management company, an entity that helped find a buyer for the leases. The company was successful and, as earlier recounted, Macquarie LLC sold the leases to Kodiak. In light of these findings, the district court did not err in concluding that Macquarie used and disclosed the trade secrets.

## 2. Consent

Macquarie argues that LexMac and Novus expressly consented to the use and disclosure of the trade secrets in sections 8.3 and 11.2 of the Credit Agreement and section 3.2 of the Mortgage. None of those provisions apply, however.

Section 8.3 allowed Macquarie Bank to use the trade secrets upon default to prepare the leases for sale, but that section applied only until Macquarie Bank's enforcement of its rights after default. The district court found that Macquarie LLC's $5.4 million credit bid satisfied the judgment for $5,296,252.29 plus interest and completed Macquarie Bank's enforcement of its rights under the Credit Agreement and Mortgage. Macquarie argues that accrued interest made the judgment worth more than $5.7 million at the time of the foreclosure sale, relying upon the testimony of one of its employees, who calculated the outstanding judgment with interest at the time of the foreclosure sale to be $5,703,338.14. The district court properly chose to

discount this evidence, however, because Macquarie presented conflicting evidence throughout the proceedings, suggesting in its motion for summary judgment that the shortfall was only $130,000, and because Macquarie never pursued a claim to recover the remaining debt. We cannot say that the district court's factual findings were clearly erroneous. Thus, because Macquarie used the trade secrets after it had completed enforcement of its rights, section 8.3 was no longer applicable.

Similarly, section 11.2 allowed Macquarie Bank to use certain trade secrets in relation to the sale of collateral. At the time the trade secrets were used, however, the leases had already been foreclosed upon and sold and were no longer serving as collateral.

Finally, Macquarie contends that it was entitled to use the trade secrets under section 3.2(v) of the Mortgage. Like the two earlier sections, section 3.2(v) of the Mortgage no longer applied by the time Macquarie used the trade secrets. Section 3.2(v) applies only "[s]o long as the Secured Indebtedness or any part thereof remains unpaid." No debt owed to Macquarie Bank remained unpaid at the time Macquarie used the trade secrets, and so Macquarie was not entitled to use and disclose them without LexMac and Novus's consent.

VI. Damages Under the North Dakota Uniform Trade Secrets Act

Under North Dakota law, damages for misappropriation of trade secrets "include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." N.D. Cent. Code § 47-25.1-03(1). As set forth earlier, the district court awarded LexMac and Novus $59,736 in actual-loss damages and $1,434,945 in unjust-enrichment damages. Both sides contend that the district court's damages calculation is clearly erroneous. See Vigora Indus., Inc. v. Crisp, 82 F.3d 785, 789 (8th Cir. 1996) (standard of review).

To determine actual loss, the district court calculated the amount of money Lexar Group spent compiling the trade-secret information. Neither party disputes this method. On cross-appeal, however, LexMac and Novus argue that the district court should have valued Knickel's "sweat equity," the time and effort he spent developing the trade secrets. Knickel testified that he spent "100%" of his time developing the information from 2000 to 2010. The district court, however, did not find Knickel credible, concluding that his testimony was "a gross exaggeration." Knickel did not keep track of his hours, and he admitted that he worked on other projects during the relevant time period. It was not clear error, then, for the district court to disbelieve Knickel's unsubstantiated assertion that he worked forty hours a week for ten years compiling the trade-secret information.

LexMac and Novus also argue that the district court clearly erred when it failed to award actual-loss damages based on lost profits. One of the reserves reports estimated the proved undeveloped reserves of the leased acreage to be $32 million. Proved undeveloped reserves are defined as reserves "reasonably certain" of recovery. Based on this report and more current pricing, Knickel testified that Lexar Group's lost profits were $28.6 million. Additionally, Macquarie's internal documents valued Lexar's leases at a minimum of $16.7 million. Thus, LexMac and Novus argue that the district court should have awarded actual-loss damages of at least $16.7 million. The district court concluded that lost profits based on the reserves reports in this case were too speculative, observing that Lexar Group had unsuccessfully attempted to develop the leases for years. We cannot say that the district court clearly erred in denying actual-loss damages based on lost profits.

Similarly, LexMac and Novus argue that the district court clearly erred by calculating Macquarie's unjust enrichment based on the sale price of the leases to Kodiak. They contend that the reserves reports and Macquarie's estimate of the leases' value demonstrate that Macquarie LLC could have sold the leases for much more, but conducted a "fire sale" to get rid of the leases. The evidence shows,

however, that Macquarie LLC hired a management company to find a buyer for the leases, that the management company sought bids from several interested parties, and that Macquarie LLC eventually sold the leases to Kodiak because no other company would pay more than Kodiak offered. The district court did not clearly err when it calculated the unjust-enrichment damages.

Macquarie also argues that the district court erroneously calculated the unjust-enrichment damages. The district court concluded that Macquarie LLC was enriched by $1,434,945, which was the sale price of the leases to Kodiak ($8.5 million), less the cost Macquarie LLC paid for the leases at the foreclosure sale ($5.4 million), the money paid to the management company to find a buyer ($820,000), and the cost of the top leases and additional leases ($845,055). Although Macquarie argues that the district court should also have subtracted the sum of money spent trying to make the only drilled well operational, it cites no evidence to establish that amount. Similarly, Macquarie argues that it lost $1 million on the sale to Kodiak, but does not support its argument with any record citations. "[A]s is our practice—without any arguments or citations to the record that would assist us in judging the merits of [the] claim of error—we decline to address it." Watson v. O'Neill, 365 F.3d 609, 615 (8th Cir. 2004).

VII. Attorney's Fees Under the North Dakota Uniform Trade Secrets Act

A court may award reasonable attorney's fees to a plaintiff who prevails on a misappropriation claim if "willful and malicious misappropriation exists." N.D. Cent. Code § 47-25.1-04. The district court found:

> Macquarie Bank and Macquarie [LLC] were both aware of their conduct and its probable consequences. Further, they designed a strategy employed to benefit personally from their actions. . . . [T]heir conduct was improper and unjustifiable, and . . . the misappropriation was willful and malicious.

-21-

D. Ct. Order of Feb 19, 2014, at 77. Macquarie does not challenge the district court's factual findings, but argues that malicious misappropriation occurs only if the tortfeasor acted with ill will, hatred, or intent to injure. See Beard Research, Inc. v. Kates, 8 A.3d 573, 600 (Del. Ch. 2010) (holding that, under the Delaware Uniform Trade Secrets Act, "[w]illfulness is 'an awareness, either actual or constructive, of one[']s conduct and a realization of its probable consequences,' while malice is . . . 'ill-will, hatred or intent to cause injury.'" (quoting NuCar Consulting, Inc. v. Doyle, No. 19766-NC, 2005 WL 820706, at *14 (Del. Ch. Apr. 5, 2005))). We review this legal issue *de novo*, Thompson v. Wal-Mart Stores, Inc., 472 F.3d 515, 516 (8th Cir. 2006), and attempt to predict how the North Dakota Supreme Court would decide this unresolved issue, G & K Servs. Co. v. Bill's Super Foods, Inc., 766 F.3d 797, 800 (8th Cir. 2014).

We believe that the North Dakota Supreme Court would not define malice to require ill will, hatred, or intent to cause injury. Applying North Dakota's general punitive damages statute, we have defined "actual malice" as including "a direct intention to injure another," as well as "a conscious disregard of another's rights." Hebron Pub. Sch. Dist. No. 13 v. U.S. Gypsum, 953 F.2d 398, 403 (8th Cir. 1992). The North Dakota Supreme Court has upheld a jury instruction that provided, for purposes of the general punitive damages statute, "Malice is not limited to a spiteful, malignant, or revengeful disposition and intent." Remmick v. Mills, 165 N.W.2d 61, 71 (N.D. 1968). Under the North Dakota Uniform Trade Secrets Act, "willful and malicious misappropriation" is required to award both punitive damages and attorney's fees. N.D. Cent. Code § 47-25.1-03(2), -04. We believe that the North Dakota Supreme Court would use the same definition of malice to award attorney's fees and punitive damages under the North Dakota Trade Secrets Act as it does to award punitive damages under the general punitive damages statute. Accordingly, a conscious disregard of another's rights constitutes malice. Having found that Macquarie consciously disregarded the rights of Lexar Group when it committed the tort of misappropriation, the district court did not err in concluding that Macquarie's

-22-

misappropriation was willful and malicious under North Dakota law, and thus we affirm the award of attorney's fees.

## VIII. Conclusion

The judgment is affirmed.

_____